## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

BLOCK, INC.,

                       Plaintiff,

      v.

VISA INC., VISA U.S.A. INC., VISA
INTERNATIONAL SERVICE
ASSOCIATION, MASTERCARD
INCORPORATED, and MASTERCARD
INTERNATIONAL INCORPORATED

                 Defendants.

CASE NO.:  23-cv-5377

**COMPLAINT**

**Jury Trial Demanded**

Block, Inc. brings this action against Visa U.S.A. Inc., Visa International Service Association, Visa Inc. (collectively, "Visa"), Mastercard Incorporated, and Mastercard International Incorporated (together, "Mastercard") as follows:

## NATURE OF THE ACTION

1.     Block, Inc. is made up of a number of different business units, one of which is Square ("Square").  Square is a cohesive commerce ecosystem that helps Sellers (merchants who utilize Square to accept payment cards, hereafter "Sellers") start, run, and grow their businesses, including by enabling Sellers to accept card payments, providing reporting and analytics, and facilitating next-day settlement.  Square's point-of-sale software and other business services help Sellers manage inventory, locations, and employees; access financial services; engage buyers; build a website or online store; and grow sales.  As a Payment Facilitator, Square processes card transactions for millions of Sellers.  As detailed herein, Square directly pays various fees, including Interchange Fees, on every card transaction it processes for its merchant clients.

2.     Visa and Mastercard have each fixed the Interchange Fees and other fees they charge in connection with the use of credit or debit cards at artificially high levels.  Defendants have also engaged in anticompetitive practices that effectively require Square to pay these fixed and inflated fees — principally, the Honor All Cards rules described below.

3.     Based on the anticompetitive conduct challenged herein, Square seeks, *inter alia*, damages and injunctive relief, as appropriate, under federal antitrust law.

## JURISDICTION AND VENUE

4.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331 and 1337.

5.     This Court has personal jurisdiction over Defendants because, among other things, Defendants:  (a) transact business throughout the United States, including in this District; (b) have substantial contacts with the United States, including in this District; and/or (c) are engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

6.     Venue in this District is proper under 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants transact business and are found in this District.

7.     Member banks of Visa and Mastercard located in this District issue Defendants' credit and debit cards and/or acquire retail merchant transactions for Visa and Mastercard credit, debit, and store-value cards.  The interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had substantial anticompetitive effects in this District.

## DEFINITIONS

8.     "Acquirer" or "Acquiring Bank" means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with Payment Facilitators and merchants that enable those entities to accept General Purpose Payment Cards for the purchase of goods and services.

9.     "Damages Period" means the time period over which Square is entitled to seek a damages award based on the anticompetitive conduct challenged herein, which is the period beginning with Square's formation to the present day and on an ongoing basis.

10.     "General Purpose Credit Card" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at

a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.

11.     "<u>General Purpose Debit Card</u>" means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution.

12.     "<u>General Purpose Payment Card</u>" means a General Purpose Credit Card or a General Purpose Debit Card.

13.     "<u>General Purpose Payment Card Network</u>" means an electronic payment system used to accept, transmit, or process transactions made by General Purpose Payment Cards for money, goods, or services, and to transfer information and funds among Issuers, Acquirers, Payment Facilitators, merchants, and users of General Purpose Payment Cards.  Both Visa and Mastercard operate General Purpose Payment Card Networks.

14.     "<u>Honor All Cards</u>" means the rules of Visa and Mastercard that require any Payment Facilitator or merchant that accepts Visa- or Mastercard-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa and Mastercard that require any Payment Facilitator or merchant that accepts Visa- or Mastercard-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand of the respective network.

15.     "<u>Interchange Fees</u>" are fees fixed by Visa or Mastercard and their member banks that are paid to Issuers by Payment Facilitators or merchants (in the absence of a Payment Facilitator) in conjunction with transactions in which Visa or Mastercard General Purpose Payment Cards are used as a means of payment for purchases of goods and services.  When one

of Square's Sellers uses Square's technology to process card transactions, Square pays these Interchange Fees directly to the Issuer.

16.     "Issuer" or "Issuing Bank" means a bank or other financial institution that issues General Purpose Payment Cards to consumers to pay for goods and services. Issuers authorized by the Visa and Mastercard General Purpose Payment Card Networks to issue Visa- and/or Mastercard-branded General Purpose Payment Cards are members of those networks.

17.     "Merchant of Record" means the entity in the payment processing structure that is authorized and held liable for the processing and settlement of transactions and accordingly enters into contractual arrangements and negotiates terms, including pricing, with the Acquirers and the relevant card networks. The Merchant of Record is contractually responsible for settling the costs incurred in the payment process. Square serves as the Merchant of Record for all transactions it facilitates for its Sellers.

18.     "Payment Facilitator" (sometimes alternatively referred to as a "Payment Services Provider") means an entity, such as Square, that holds the direct relationship with both the merchant and the corresponding Acquiring Bank and facilitates all aspects of a card transaction on behalf of the merchant. Square serves as the Payment Facilitator or Payment Services Provider for all transactions it facilitates for its Sellers.

19.     "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by presenting his or her card at the point-of-sale and entering a personal identification number ("PIN") as the verification method.

20.     "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards. The "Visa Signature

Preferred Card" product and "World Mastercard Card" product are examples of Premium Payment Cards.

21.     "<u>Signature Debit Card</u>" means a General Purpose Debit Card with which a cardholder authorizes a withdrawal from their bank account, usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.

<b><u>PARTIES</u></b>

**A.      Plaintiff**

22.     Block, Inc., formerly known as Square, Inc., is a Delaware corporation.  Block offers products and services under the name Square that help Sellers start, run, and grow their businesses, including by enabling Sellers to accept card payments.  Square accepts Visa and Mastercard credit and debit cards for payment at its millions of Sellers through a variety of methods, including, notably, its card processing services.  Square offers a number of services including financial services, marketing services, and payment and point of sale technology.  Square earns the majority of its revenue through transaction-based fees derived from these card-related services.

23.     During the Damages Period, Square has accepted Visa and Mastercard credit and debit cards on behalf of millions of Sellers, the majority of which are small and medium-sized businesses who use Square to accept cards through Square's innovative technology and take advantage of Square's suite of products.  The convenient, streamlined, affordable, and secure payment facilitation services that Square offers its Sellers stands in sharp contrast to the opaque, cumbersome, expensive payment processing services traditionally offered by the card networks and their member banks.

24.     On behalf of the following entities, all of which Block acquired either by merger or asset purchase agreement, Block also asserts the legal claims as enumerated herein, to the

fullest extent permitted by law: Afterpay Limited; Bookfresh, LLC; Caviar, Inc.; Eloquent Labs Incorporated; Entrees on Trays, Inc.; Fastbite, Inc.; GoParrot, Inc.; Kinetic Farm, Inc. d/b/a OrderAhead (held at Looper Holdings, LLC); Mainline Delivery.com; Stitch Labs, Inc.; Third Party Technologies Inc.; Third Party Trade, LLC; Weebly, Inc.; and Your Majesty Co.

**B.    Defendants**

25.    Prior to the Visa initial public offering ("IPO"), Visa International and Visa U.S.A. were each bank associations that were governed by a board of directors comprised of bank executives selected from their member banks. Visa International also had regional boards of directors for each of its geographic regions.

26.    In 2007 and 2008, Visa U.S.A. and Visa International, in addition to other Visa entities not named as Defendants, conducted a number of corporate restructurings to combine several previously independent corporate entities into Defendant Visa Inc. On March 19, 2008, Visa Inc. conducted an IPO through which it offered ownership shares to the general public and also issued ownership shares to its member banks. As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California. Upon the restructuring, Visa U.S.A. and Visa International became wholly-owned subsidiaries of Visa Inc., and they continue to operate as such today. Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

27.    Visa operates General Purpose Payment Card Networks, and did so throughout the Damages Period.

28.    Prior to the Mastercard IPO, Mastercard Incorporated and Mastercard International were each bank associations that were governed by a global board of directors, as

well as regional boards of directors for each of their geographical regions that were comprised of bank executives selected from their member banks.

29.     On May 25, 2006, Mastercard Incorporated and Mastercard International conducted an IPO and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to Mastercard's member banks.  As a result, Mastercard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, Mastercard International has remained Mastercard Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as Mastercard Worldwide.  Mastercard Incorporated and Mastercard International (and Mastercard Worldwide) are collectively referred to herein as "Mastercard."

30.     Mastercard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

## CO-CONSPIRATORS

31.     Various persons and entities participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies.  The co-conspirators include, but are not limited to, the following:  (a) Issuers that have issued Visa and Mastercard payment cards and have agreed to inflate, set, and enforce, through anticompetitive rules and restraints, Visa and Mastercard Interchange Fees; (b) Acquirers that acquire Visa and Mastercard transactions from Square and who agreed to and have imposed the anticompetitive rules and restraints on Square; and (c) banks that have or had membership on Visa's or Mastercard's board of directors and, as described above, specifically adopted and agreed to impose the challenged rules and restraints upon Square, its Sellers, and other Payment Facilitators.

## FACTUAL ALLEGATIONS

**A.      Square's Payment Services Platform**

**1.      Payment processing with Square**

32.      Square was established to solve a persistent inefficiency:  in order to accept card payment for goods or services, a merchant had to overcome significant technological, financial, and logistical barriers.  Any merchant interested in accepting any payment cards was presented with hundreds of pages of complex contractual documents, had to purchase a dedicated multi-thousand-dollar card processing terminal, and was subject to a highly opaque and onerous fee structure.

33.      To address this problem, Square developed small, convenient, inexpensive, secure devices and associated software that allowed anyone to accept card payments with their existing smartphone.  Over time, Square has continually iterated on and further developed other hardware and software that allows Sellers to stay current with the latest technological innovations in payment processing and payment card security.

34.      In relevant part, Square's card transaction service operates as follows:  When a consumer is ready to make a purchase with a payment card from a Square Seller, the Seller initiates the transaction using Square's software.  As a Payment Facilitator and the Merchant of Record, Square then passes the transaction information to the Acquirer.

35.      Next, the Acquirer routes the transaction to the relevant card network affiliated with the consumer's card (*e.g.*, Visa, Mastercard, American Express, etc.).  Square pays a variety of card network fees associated with these networks, including assessments pegged to the transaction amount.  The card network then routes the transaction to the Issuer, which authorizes or declines the consumer's transaction.  The Issuer communicates through the card network to the Acquirer and Square to inform the Seller that the transaction has been authorized or declined.

36.     The Issuer then deducts an Interchange Fee fixed by Visa or Mastercard (as both a percentage of the amount of the transaction and a fixed fee per transaction) from the funds owed to Square before disbursing the remaining funds to Square's Acquiring Bank through the card network.  The Interchange Fee is deducted before the funds are transmitted to Square, meaning that Square is the party that directly pays the Interchange Fee to the Issuer.  This Interchange Fee varies based on the consumer's card type, the merchant category code, the transaction type, and the transaction size.  Any applicable transaction-level card network assessment fees are also assessed to Square.

37.     Finally, Square remits the funds to the Seller, minus the fees charged by Square to its Sellers for payment services.  Under Square's transaction process, Square serves as the Payment Facilitator and Merchant of Record, acting as the touch point for the Seller to the rest of the payment chain.  Square Sellers do not pay the Interchange Fees fixed by Visa and Mastercard to anyone.  They pay instead the fees set by Square for its payment services.

38.     Square is the direct payor of the Interchange Fees at issue, and the direct purchaser of card acceptance services from Visa and Mastercard.  Square is the entity that directly contracts with Visa and Mastercard in order to facilitate card transactions with Visa and Mastercard for its millions of Sellers.  Consistent with Square's status as the Payment Facilitator and Merchant of Record, Square's Sellers do not have their own merchant identification numbers, or "MIDs" (or acquiring merchant identification numbers).  Square's Sellers' transactions are, instead, processed under Square's MIDs.

39.     The Acquirers for the Visa and Mastercard transactions for which Square is a Payment Facilitator and Merchant of Record are Chase Paymentech and Wells Fargo Merchant Services ("WFMS").  Square's contracts with Chase Paymentech and WFMS expressly provide

that Square is and stands in the shoes of the typical "merchant" for all purposes for all transactions it facilitates.

40.     Square's contractual relationship with these two Acquiring Banks provide that Square is responsible for payment of Interchange Fees for the transactions it facilitates for its Sellers.  Square's agreements with these two Acquirers specify that Square is responsible for paying the relevant Interchange Fees regardless of whether a Seller pays Square for its payment processing services.

41.     Square's agreements with its Sellers also provide that Square is the Merchant of Record and that Square is the entity in the payment structure that has the relevant relationship with Visa and Mastercard.  In its role as a Payment Facilitator and Merchant of Record, Square is responsible for paying Interchange Fees on each transaction, and assumes financial responsibility for chargebacks and fees for network rule violations.  The designation of Square transactions by the Visa and Mastercard networks confirms this relationship, in that all of Square Sellers' transactions are processed under Square's MIDs.

42.     Visa's rules confirm that Square stands in the shoes of the Sellers whose transactions it facilitates.  Visa's current (April 15, 2023) Rule 5.3.1.1, provides, *inter alia*, that any Acquirer must include in its agreement with a Payment Facilitator, such as Square, that the Payment Facilitator "[i]s responsible and financially liable for each Transaction processed on behalf of the Sponsored Merchant, or for any disputed Transaction or credit."

### 2.     The impact of Square's innovations

43.     Square's innovative, simplified, secure approach to payment processing provides wide-ranging benefits across the economy.  Square's products benefit businesses in that they enable merchants to accept more types of payment, benefit consumers in that consumers have

more choice in how to pay for goods and services, and also benefit the payment card networks and their member banks as a result of broader merchant acceptance and fees on every card transaction Square facilitated.

44.     In bringing card payment to millions of Sellers, Square has provided Visa and Mastercard with the Interchange Fees associated with processing payments at what had previously been largely cash-only businesses.

**B.     Visa and Mastercard**

45.     Visa and Mastercard have used a series of agreements and practices to fix prices, to avoid competition, and protect their market power.

46.     A key pillar of these agreements and practices are Visa's and Mastercard's Honor All Cards rules.  Pursuant to these rules, each network's member/owner banks (including every one of the networks' Issuers and Acquirers) have agreed that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  These "all or nothing" rules constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards.  In addition, those same banks have agreed to fix prices via "default" Interchange Fee rules, whereby fixed Interchange Fees apply to every transaction for which the Issuer and Acquirer or merchant have not individually negotiated fees (which rarely, if ever, occurs).

47.     Visa and Mastercard themselves are the enterprises by which competing banks implement and effectuate their agreements not to compete and agreements to fix prices.  These enterprises rely on rules — such as the Honor All Cards and default Interchange Fee rules — that bind all Visa and Mastercard Issuers and Acquirers.  Following the Visa and Mastercard IPOs,

the Visa and Mastercard member banks have continued to conspire to fix inflated fees and impose anticompetitive restraints, collectively agreeing as members of both networks to various fees and rules. All Issuer members of the Visa and Mastercard networks receive supracompetitive Interchange Fees and continue to collect these inflated fees.

48. Although Visa and Mastercard initially focused their conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card transactions market, they leveraged it to achieve substantial market power in the General Purpose Debit Card transactions market.

49. Defendants set both Issuers' General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels — fees directly paid to Issuers by, among others, Square.

### 1. Visa and Mastercard facilitated horizontal agreements of their member banks

50. Before their IPOs, Visa and Mastercard were associations of competitor banks. Pre-IPO, these banks exercised complete control over every aspect of Visa's and Mastercard's business. This control was used to implement the member banks' agreements (through the Honor All Cards rules) not to compete for merchant acceptance of General Purpose Payment Cards, and the associated agreements (through the default Interchange Rules) to fix the prices of Interchange Fees for Visa and Mastercard General Purpose Payment Card transactions.

51. The agreements broadened as more banks joined Visa and Mastercard and agreed to abide by agreements not to compete and to fix prices. The agreements also broadened during that time period when the banks added new high-Interchange Fee products — such as the Visa Signature and Signature Preferred Cards and the World and World Elite Mastercard Cards — to the universe of Visa and Mastercard products that were subject to the same conspiracies.

52.     Like those restrictive provisions to which the member banks agreed in their capacities as board members and/or owners of Visa and Mastercard, the anticompetitive conduct by Visa and Mastercard establishing the agreements not to compete and price-fixing schemes were the products of horizontal agreements among competing Issuers.

### 2.     The Honor All Cards rules constitute horizontal agreements not to compete on price

53.     In order to eliminate any incentive for Issuers to compete for merchant acceptance based on the price of interchange, as they would have done in a competitive market, the member banks on Visa's and Mastercard's governing boards of directors approved the Honor All Cards rules.  Visa's and Mastercard's policies require that their Issuers and Acquirers agree to abide by each of the networks' rules (including the HAC Rules), and that the rules will be enforced upon merchants.  The rules require Square — as Merchant of Record — to accept *all* of a network's Issuers' General Purpose Credit (or all Debit) Cards bearing the network's brand if Square wants to accept any single Issuer's General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  *See, e.g.*, Visa Rule 1.5.4.2. *Visa Core Rules and Visa Product and Service Rules* (April 15, 2023); Mastercard Rule 5.11.1, *Mastercard Rules* (Dec. 13, 2022). These rules also prohibit Square from steering consumers toward less expensive General Purpose Payment Cards.

54.     Under these "all or nothing" rules, Issuers need not worry about losing business to a lower-cost competitor because all cards issued by every Issuer must be accepted at the default Interchange Fee rates.  Thus, if Square accepts a cheaper Visa or Mastercard standard General Purpose Credit Cards, for which it would pay substantially lower (but still supracompetitive) Interchange Fee, it must also accept a Visa Signature Preferred Card or World Elite Mastercard transaction, which bear higher Interchange Fees.

55.     But for the Honor All Cards rules, it would have been in the economic interest of an individual, profit-maximizing Issuers to lower the price it charged to compete for Square's business against other banks issuing similar General Purpose Payment Cards.  These "all or nothing" rules, however, eliminated the incentives to engage in such competition and to lower prices.  With the Honor All Cards rules in place, it does not make economic sense for any Issuer to compete on price because merchants are forced to accept that Issuer's cards even though they are being charged inflated prices.

56.     As a result of the Honor All Cards rules, Square is unable to have Issuers compete for its business by offering more competitive Interchange Fees.

57.     The Honor All Cards rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Cards rules have some colorable rationale, their objectives could be realized through less restrictive means.

### 3.     The Interchange Fee rules are unlawful horizontal agreements on price

58.     Defendants fix the prices of Interchange Fees.  Both Visa and Mastercard then require that the fixed Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement).  *See, e.g.*, Visa Rule 1.9.1.2. *Visa Core Rules and Visa Product and Service Rules* (April 15, 2023); Mastercard Rule 8.3, *Mastercard Rules* (Dec. 13, 2022).  Visa's and Mastercard's policies further required that their Issuers and Acquirers agree to abide by each of the networks' rules (including the "default" Interchange Rules), and that the rules will be enforced on merchants.

59.     While competition for merchant acceptance would have motivated rival Issuers to set lower fees than the "default" Interchange Fees fixed by Visa and Mastercard, they have not

done so because the Honor All Cards rules, working in tandem with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the high levels being fixed by the conspiracies.

60.     All Issuers use the same Interchange Fee schedules for any given Visa and Mastercard payment transaction but, within each of those schedules, there is variability in the fees charged for various transactions.  For example, a schedule of Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium Payment Cards).  This schedule of Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.  This collusion constitutes price fixing.

      **4.     Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power**

61.     Using price fixing to induce Issuers to join their associations, Visa and Mastercard acquired substantial market power in the General Purpose Payment Card transactions markets, as courts have repeatedly held.

62.     That Visa and Mastercard possess substantial market power is supported by direct evidence, including the following:

      *(a)     Ability to raise Interchange Fees:  Visa*

63.     Visa's substantial market power has existed and increased for the last several decades.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants.

64.     In the General Purpose Credit Card transactions market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards.  Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards.  Issuers responded by converting large portions of their outstanding cards to Signature and World cards with higher Interchange Fees, and the overall Interchange Fees that merchants paid for transactions increased dramatically.

65.     Visa continues to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation.  Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

66.     In the mid-2000s, Visa raised its Signature Debit Card Interchange Fees, and then exercised its monopoly power to increase PIN Debit Card Interchange Fees as well. Notwithstanding these price increases, Visa's debit volumes have increased during the Damages Period.  As with General Purpose Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit products despite these significant price increases.

                    (b)     *Ability to raise Interchange Fees:  Mastercard*

67.     Mastercard has also possessed and exercised substantial market power for decades, with such power increasing over time.  By the 1990s, Mastercard General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Mastercard General Purpose Credit Cards became a competitive necessity for the vast majority of merchants.

68.     Like Visa, Mastercard has raised the Interchange Fees that merchants pay for accepting Mastercard General Purpose Credit Cards without losing merchant acceptance.  Like Visa, Mastercard permitted Issuers to reclassify standard Mastercard General Purpose Credit

Cards as Premium Payment Cards and, in doing so, allowed those Issuers to unilaterally hike the Interchange Fees that merchants paid for transactions made with such cards.

69.     Mastercard's substantial market power was further evidenced by its ability to successfully charge merchants higher Interchange Fees than Visa charged, even though Mastercard had lower market shares.  Throughout the Damages Period, Mastercard fixed Interchange Fees that were higher than Visa's.  If it did not have substantial individual market power over merchants, Mastercard could not have consistently and profitably maintained higher Interchange Fees than Visa.

*(c)     Price discrimination*

70.     Visa's and Mastercard's ability to price discriminate also illustrates their market power.  Both Visa and Mastercard establish separate Interchange Fees for each merchant category, for each of the networks' card products (credit, Signature Debit, PIN Debit, and commercial), and for an individual merchant's acceptance volume.  Thus, two transactions conducted with the same Visa or Mastercard payment card could have vastly different Interchange Fee rates based upon the size or type of merchant that accepted the card.  As the number of interchange categories has increased dramatically, Visa and Mastercard have captured ever-greater margins through increased opacity and complexity.

*(d)     Setting supracompetitive prices unrelated to cost*

71.     The Interchange Fees set by Visa and Mastercard are not based on cost, as they would be in a competitive market.  Rather than being tied to costs, the networks set Interchange Fees for each merchant segment based upon that segment's elasticity of demand — *i.e.*, the degree to which merchants in that segment "must take" their cards.

72.     In addition, since 2012, Visa has imposed on merchants and Payment Facilitators a fee called the Fixed Acquirer Network Fee ("FANF").  This fee is based on the number of locations a merchant has — in Square's case, many thousands when each Seller is considered a "location."  The fee is highly complex, difficult to calculate, and unavoidable.  Merchants and Payment Facilitators like Square must pay to participate in the Visa network and accept *any* Visa credit or debit cards.  In 2017, Mastercard rolled out its version of this fee, called the Merchant Location Fee ("MLF"), which operates in a similar fashion.  Like any other merchant, Square can avoid the FANF only by declining to accept *any* Visa products and can avoid the MLF only by declining to accept *any* Mastercard products.  The FANF and MLF are structured such that they can be offset only by committing to route substantial transaction volumes over the more expensive Visa and Mastercard networks, respectively.

73.     Square directly pays Visa the FANF.  Over time, the FANF charged to Square by Visa has increased, illustrating Visa's ability and willingness to abuse its monopoly power.

74.     Square directly pays Mastercard the MLF.  Over time, the MLF charged to Square by Mastercard has increased, illustrating Mastercard's ability and willingness to abuse its monopoly power.

*(e)     Enforcement of anticompetitive rules and policies*

75.     Visa's and Mastercard's successful enforcement of anticompetitive rules and policies that harmed merchants without losing merchant acceptance or transaction volume demonstrates the substantial market power that Visa and Mastercard had in the General Purpose Payment Card transactions markets.

76.     Under the Honor All Cards rules, Square must accept *all cards* of either Visa or Mastercard's brands, regardless of the Issuer or level of Interchange Fee that Square will pay.

Visa's and Mastercard's anti-steering rules also prevent any erosion of Visa's and Mastercard's market power.

77.     Despite the adverse economic impact of these rules and policies on merchants, given Visa's and Mastercard's substantial market power, merchants could not afford to stop accepting Visa or Mastercard transactions.  Square cannot drop Visa or Mastercard General Purpose Credit or Debit Cards without depriving Square Sellers of an unacceptable number of sales.

     5.     **The Visa and Mastercard IPOs were changes in corporate form that maintained and enhanced the existing practices**

78.     The member banks that sat on the Visa and Mastercard boards and controlled them, approved Mastercard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs.  The member banks structured post-IPO Visa and Mastercard in ways that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint.

79.     In response to a host of additional antitrust challenges, Visa and Mastercard, and their member banks, decided to change the organizational structures of Visa and Mastercard to attempt to evade antitrust liability through superficial changes in corporate form.  The member banks agreed that post-IPO Visa and Mastercard would continue to support the agreements not to compete and to fix prices.

80.     Post-IPO, Visa and Mastercard act as the pricing and rules enforcement agents for their member banks.  Through the corporate reorganizations and subsequent IPOs, each member bank effectively delegated to Visa and Mastercard, in perpetuity, the ability to fix the bank's pricing to merchants.  Each member bank knew that all other Visa and Mastercard member

banks were also delegating their pricing decisions to Visa's and Mastercard's member banks when they voted to approve Visa's and Mastercard's restructurings.

81.     Moreover, as part of the corporate reorganizations leading to their respective IPOs, the member banks reaffirmed and effectively readopted each network's rules, including the default Interchange Fee and Honor All Cards rules.

82.     Defendants' conduct confirms that the IPOs did not terminate their price-fixing practices or reduce Visa's and Mastercard's market power. Post-IPO, Visa and Mastercard have exercised their substantial market power by imposing new network fees that merchants must pay, Visa's and Mastercard's Interchange Fees have remained at supracompetitive levels, and Visa has maintained its monopoly power in the General Purpose Debit Card transactions market.

**C.     Defendants' Interchange Fee Practices Are Restraints of Trade Without Justification**

83.     General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally. Moreover, the Interchange Fees set by Defendants are not based on cost. Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint.

84.     International experience regarding Interchange Fees on General Purpose Credit Card transactions shows that Interchange Fees in the United States have been fixed at supracompetitive levels. Regulations have been introduced to reduce Interchange Fees in various foreign countries. Prior to enactment of these regulations, Visa and Mastercard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry. In reality, no such "death spiral" or collapse occurred. To the contrary, Visa's and Mastercard's General Purpose Credit Card

volumes have *increased* in various foreign countries, including Australia and across the European Union.

85.     In neither Australia nor the European Union do Visa and Mastercard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card transactions markets in the United States.  Despite this, Visa's and Mastercard's General Purpose Credit Card Interchange Fees in the United States are *higher* than nearly every other General Purpose Credit Card Network outside the United States, including Visa's and Mastercard's own networks in other countries.  As the costs associated with issuing Visa and Mastercard General Purpose Credit Cards have dramatically declined, Visa and Mastercard have raised their Interchange Fees, demonstrating market power.

## ANTITRUST INJURY

86.     Square has suffered direct antitrust injury from Defendants' conduct.  Square has directly paid substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.  Square also has been deprived of the benefits of competition limited by this conduct in the relevant markets.

87.     The effect of these artificially inflated fees — assessed to and paid by Square — is higher retail prices paid by consumers economy-wide.  As retail prices increase in response to inflated fees, consumers can afford less and thus purchase less, reducing output.

## RELEVANT MARKETS

88.     Visa and Mastercard operate payment platforms.  These are "two sided" platforms in that merchants want to accept the payment cards that cardholders carry and use, and cardholders want to carry and use payment cards that are widely accepted.

89.     Payment platforms effectuate transactions to merchants from their customers through the use of credit or debit transactions, sometimes performed with a Payment Facilitator

such as Square.  The Visa and Mastercard payment-card networks thus sell transactions to both "sides" of the market — Payment Facilitators/merchants, on the one hand, and consumers on the other.  As stated by the Supreme Court, "credit-card companies are best understood as supplying only one product — transactions — which is jointly consumed by a cardholder and a merchant."

90.     There are two "transactions" product markets in which Defendants participate: (i) the market for General Purpose Credit Card transactions in the United States (*i.e.*, the credit card market); and (ii) the market for General Purpose Debit Card transactions in the United States (*i.e.*, the debit card market).

91.     In the case of transaction networks, where the relevant good is the payment card transaction itself (such as the markets for General Purpose Payment Card transactions), economic literature indicates that competitive effects on both sides of the market should be taken into consideration.  As set forth herein, Visa, Mastercard, and their respective network banks possess market power and their conduct has negative competitive effects for:  (i) all entities paying Interchange Fees and other network fees (be they merchants or Payment Facilitators), (ii) businesses regardless of whether they use a Payment Facilitator, and (iii) consumers.  All of these negative effects occur in the two-sided, transactions markets defined above.

92.     The markets for General Purpose Credit Card transactions and General Purpose Debit Card transactions are distinct.  Consumer demand establishes separate General Purpose Credit Card and General Purpose Debit Card markets.  There are, accordingly, corresponding markets for General Purpose Credit Card *transactions* and General Purpose Debit Card *transactions*.  These markets capture both sides of the two-sided "transaction platform" of the networks' payment platforms.  Visa and Mastercard have exercised market power within these markets.

A.    **The Markets for General Purpose Credit Card Transactions and General Purpose Debit Card Transactions Are Distinct**

1.    **General Purpose Credit Card transactions**

93.    There have been relevant product markets for General Purpose Credit Cards and General Purpose Credit Card transactions throughout the Damages Period.  Certain characteristics of credit cards make them unique.  General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card.  These cards provide consumers deferred payment and, typically, the opportunity to revolve balances over time.

94.    From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities.  Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment.  This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

95.    General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards.  This has been the case throughout the Damages Period.

96.     The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

97.     Visa and Mastercard have continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no major merchants have stopped accepting Visa and Mastercard General Purpose Credit Card transactions.  Merchants continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that merchants must accept them.  General Purpose Credit Card transactions is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

## 2.     General Purpose Debit Card transactions

98.     There have been relevant product markets for General Purpose Debit Cards and General Purpose Debit Card transactions throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-inelasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets to this day.

99.     General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA or checking account.  General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.

100.    Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality to consumers — a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account to the merchant's account. While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes. Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this fact.

101.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions. Because payments are deducted in a matter of hours (or a few days at most) from a consumer's account, General Purpose Debit Cards are differentiated from General Purpose Credit Cards. Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards. Consumers tend to use General Purpose Debit Cards for everyday and small purchases. Many consumers segment their purchases and prefer to put these everyday purchases on their General Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are not consumed on a monthly basis.

102.    Consumers view General Purpose Debit Cards as superior to cash and checks and, thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase. Cash and checks also are not reasonably interchangeable with General Purpose Debit Card transactions for merchants. As the price of PIN Debit Card acceptance increased to the supracompetitive levels of today, merchants did not substitute away from debit.

### B.    The Geographic Market Is the United States

103.    The geographic market for all relevant product markets has been the United States and its territories throughout the Damages Period. Many of Visa's and Mastercard's rules

regarding General Purpose Credit Card and General Purpose Debit Card transactions apply only to the U.S. market.  Visa and Mastercard also set policies and pricing — including Interchange Fees — separately for the United States from other regions.  Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks.

      **C.**    **Defendants' Conduct Has Had Adverse Competitive Effects In Any Relevant Market**

      104.    Visa and Mastercard exercise substantial market power in the market for General Purpose Credit Card transactions.  Visa and Mastercard collectively account for over 70% of transaction volume for General Purpose Credit Cards in the United States.  Combined with the significant entry barriers facing potential new, competing payment networks, this cardholder penetration gives Visa and Mastercard power to control prices or exclude competition across their credit card payment platforms.  Visa and Mastercard's ability to raise Interchange Fees without losing transaction volume in General Purpose Credit Cards is direct evidence of their market power.

      105.    Visa also exercises monopoly power in the market for General Purpose Debit Cards and services, including under a platform-wide market definition encompassing both merchants and consumers.  Visa has demonstrated its ability to control prices or output by profitably raising interchange fees net of any cardholder rewards for its debit products.  This ability to raise Interchange Fees net of any cardholder rewards without losing merchant acceptance or transaction volume is directly probative of its monopoly power across the General Purpose Debit Card payment platform.

106.    Defendants' price fixing and Visa's monopolization have reduced total output by raising net prices to Visa and Mastercard customers and by resulting in products of decreased quality.  Visa and Mastercard's market power have allowed them to impose supracompetitive Interchange Fees on merchants.  These inflated fees have forced merchants to raise retail prices above what they would charge if competition existed in the payment services industry.  The net result is fewer sales for merchants and higher costs to consumers

107.    This reduced cardholder purchasing power, in turn, reduces total output — *i.e.,* the quantity of credit and debit card purchases (and total purchases) — below the competitive level.

108.    Visa and Mastercard cardholders would enjoy equal or greater cardholder rewards absent Defendants' price fixing and Visa's monopolization.  High Interchange Fees are not necessary to fund competitive cardholder reward programs.  Given the miniscule cost of transaction processing today, Issuers pocket most of the interchange revenue as increased profits rather than distributing it in the form of rewards.

## CLAIMS FOR RELIEF

**Count 1**:  **Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)**

109.    Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

110.    Visa and its member banks' agreement not to compete and to fix prices constitute anticompetitive horizontal restraints.

111.    Visa and its member banks have maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

112.     This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Square paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

113.     The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  But even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

114.     Square suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

115.     As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Square has been injured in its business and property in an amount to be determined at trial.

**<u>Count 2</u>:  Against Visa for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

116.     Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

117.     Visa and its member banks' agreement not to compete and to fix prices constitute anticompetitive horizontal restraints.

118.     Visa and its member banks have maintained the conspiracy for Visa General Purpose Debit Card transactions throughout the Damages Period.

119. This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Square paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses. These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

120. The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act. Even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

121. Square suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

122. As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Square has been injured in its business and property in an amount to be determined at trial.

**Count 3**:  **Against Mastercard for Horizontal Price-Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)**

123. Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

124. Mastercard and its member banks' agreement not to compete and to fix prices constituted anticompetitive horizontal restraints.

125. Mastercard and its member banks have maintained the conspiracy for Mastercard General Purpose Credit Card transactions throughout the Damages Period.

126.   This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Square paid to Issuers for Mastercard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Mastercard and its owner/member banks that the banks will not compete for merchants' acceptance of Mastercard transactions.

127.   The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act.  Even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

128.   Square suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

129.   As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Square has been injured in its business and property in an amount to be determined at trial.

**Count 4:  Against Mastercard for Horizontal Price-Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

130.   Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

131.   Mastercard and its member banks' agreement not to compete and to fix prices constituted anticompetitive horizontal restraints.

132.   Mastercard and its member banks have maintained the conspiracy for Mastercard General Purpose Debit Card transactions throughout the Damages Period.

133. This conspiracy anticompetitively increased, and maintained, the Interchange Fees that Square paid to Issuers for Mastercard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses. These price increases were the products of the agreement among Mastercard and its owner/member banks that the banks will not compete for merchants' acceptance of Mastercard transactions.

134. The price-fixing conspiracy and agreement not to compete are *per se* unlawful under Section 1 of the Sherman Act. Even if analyzed under a quick look or rule of reason, this conspiracy and agreement not to compete are unreasonable restraints of trade in violation of Section 1. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

135. Square suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

136. As a direct and proximate result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Square has been injured in its business and property in an amount to be determined at trial.

**Count 5**:  **Against Visa for Vertical Price Restraints in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)**

137. Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

138. Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

139. Visa entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Cards rules. In turn, Visa acted as the enforcement agent

for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations. These agreements have continued in full effect throughout the Damages Period.

140. These vertical price restraints imposed supracompetitive Interchange Fees on Square for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses. These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

141. Square suffered antitrust injury from these unreasonable restraints of trade.

142. As a direct and proximate result of this violation of Section 1 of the Sherman Act, Square was injured in its business and property in an amount to be determined at trial.

**Count 6**: **Against Visa for Vertical Price Restraints in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

143. Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

144. Visa and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

145. Visa entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Cards rules. In turn, Visa acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations. These agreements have continued in full effect throughout the Damages Period.

146.     These vertical price restraints imposed supracompetitive Interchange Fees on Square and other merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

147.     Square suffered antitrust injury from these unreasonable restraints of trade.

148.     As a direct and proximate result of this violation of Section 1 of the Sherman Act, Square was injured in its business and property in an amount to be determined at trial.

**Count 7:**  **Against Mastercard for Vertical Price Restraints in the Market for General Purpose Credit Card Transactions (Sherman Act Section 1)**

149.     Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

150.     Mastercard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

151.     Mastercard entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Mastercard, including the default Interchange Fee and Honor All Cards rules.  In turn, Mastercard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations.  These agreements have continued in full effect throughout the Damages Period.

152.     These vertical price restraints imposed supracompetitive Interchange Fees on Square for Mastercard General Purpose Credit Card transactions, and it imposed additional

damages in the form of network fees, fines, and fraud losses. These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

153. Square suffered antitrust injury from these unreasonable restraints of trade.

154. As a direct and proximate result of this violation of Section 1 of the Sherman Act, Square was injured in its business and property in an amount to be determined at trial.

**Count 8:** **Against Mastercard for Vertical Price Restraints in the Market for General Purpose Debit Card Transactions (Sherman Act Section 1)**

155. Block incorporates by reference each and every allegation contained in the foregoing paragraphs.

156. Mastercard and its member banks' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

157. Mastercard entered into an express vertical agreement with each of the member banks binding all of them to comply with the rules and regulations adopted by Mastercard, including the default Interchange Fee and Honor All Cards rules. In turn, Mastercard acted as the enforcement agent for its rules and regulations and held Issuing and Acquiring members responsible for compliance with these rules and regulations. These agreements have continued in full effect throughout the Damages Period.

158. These vertical price restraints imposed supracompetitive Interchange Fees on Square for Mastercard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses. These restraints have continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in

violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

159.    Square suffered antitrust injury from these unreasonable restraints of trade.

160.    As a direct and proximate result of this violation of Section 1 of the Sherman Act, Square was injured in its business and property in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Square prays for a judgment in its favor and against Defendants and for the following relief:

A.    That the Court declare, adjudge and decree that Defendants have committed the violations of the laws alleged herein;

B.    That the Court award damages sustained by Square because of Defendants' misconduct, in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees and costs of suit;

C.    That the Court award restitutionary damages to Square;

D.    That the Court enjoin Visa's FANF;

E.    That the Court enjoin Mastercard's MLF; and

F.    That the Court order such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Square hereby demands a trial by jury of all issues properly triable thereby.

Dated:  July 14, 2023

By:        /s/ *Marc L. Greenwald*

Marc L. Greenwald
Manisha M. Sheth
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
marcgreenwald@quinnemanuel.com
manishasheth@quinnemanuel.com

Justin T. Reinheimer
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700
justinreinheimer@quinnemanuel.com

*Attorneys for Plaintiff Block, Inc.*